809 So.2d 176 (2001)
SEA ROBIN PIPELINE CO., United Offshore Company and Southern Deepwater Pipeline Company
v.
NEW MEDICO HEAD CLINIC FACILITY.
Insurance Company of North America
v.
Community Re-Entry Services of Louisiana, Inc. d/b/a New Medico Rehabilitation Center of Louisiana and/or Sun Creek Ranch.
Insurance Company of North America
v.
New Medico Head Clinic Facility.
No. 2000 CA 0595, 2000 CA 0596, 2000 CA 0597.
Court of Appeal of Louisiana, First Circuit.
June 22, 2001.
Rehearing Denied August 13, 2001.
*177 Vance E. Ellefson, Metairie, for Plaintiffs/Appellants, Sea Robin/United Offshore.
James B. Doyle, Lake Charles, Julian J. Rodrigue, Jr., Covington, for Defendants/Appellees, New Medico/Continental.
Thomas H. Huval, New Orleans, for Defendant/Appellee, INA-Cigna.
Before: CARTER, C.J., GUIDRY, WEIMER, PETTIGREW, and KLINE,[1] JJ.
CARTER, Chief Judge.
Russell Fage suffered severe head injuries in an accident on an oil platform off the coast of Louisiana in 1990. He and his wife Lucinda Fage sued Sea Robin Pipeline Company, United Offshore Company, and Southern Deepwater Pipeline Company,[2] eventually settling for $2,150,000. The three original defendants, together with Insurance Company of North America (INA), who participated financially in the settlement, sought contribution from Community Re-Entry Services of Louisiana, Inc., d/b/a New Medico Rehabilitation Center of Louisiana and/or Sun Creek Ranch (Medico) and its insurer, Continental Insurance Company (collectively, defendants).[3] They contended that while being treated in Medico's facility in Folsom, Louisiana, Mr. Fage was frightened so badly by a negligently supervised patient that he terminated his inpatient rehabilitation treatment and refused to return there or to any other inpatient facility, thereby increasing his damages.
Defendants moved for summary judgment, contending plaintiffs could not sustain *178 their burden of proving 1) that an incident occurred while Mr. Fage was at Medico; 2) that the incident caused him to leave Medico; 3) that the incident prevented Mr. Fage from receiving rehabilitation; and 4) that the incident caused Mr. Fage any damage. The trial court found there was a genuine issue of material fact as to whether the incident occurred but that plaintiffs provided no factual support sufficient to establish they would be able to prove at trial that the incidents caused Mr. Fage to leave Medico or that it was the reason he refused further inpatient treatment. Thus, the court granted the motion for summary judgment and dismissed all claims presented against Medico and Continental in the consolidated suits. Sea Robin Pipeline Company, United Offshore Company, and Southern Deepwater Pipeline Company (plaintiffs) appeal. INA did not appeal, and the judgment dismissing its claims is now final.

APPLICABLE LAW
A motion for summary judgment is a procedural device used to avoid a fullscale trial when there is no genuine factual dispute. Allen v. Blanchard, 99-0277, p. 3 (La.App. 1st Cir.3/31/00), 763 So.2d 704, 706. Appellate courts are to review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Federal Savings & Loan Ass'n, 615 So.2d 318, 325 (La.1993). The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966 B.
The burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden on the motion does not require that all essential elements of the adverse party's claim, action or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense. Thereafter, if the adverse party fails to provide factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. LSA-C.C.P. art. 966 C(2); Calhoun v. Hoffman-La Roche, Inc., 98-2770, p. 5 (La.App. 1st Cir.2/18/00), 768 So.2d 57, 61, writ denied, 00-1223 (La.6/23/00), 765 So.2d 1041.
As stated above, the four issues plaintiffs must prove at trial are that 1) an incident occurred while Mr. Fage was at Medico; 2) the incident caused him to leave Medico; 3) the incident prevented him from receiving rehabilitation; and 4) that the incident damaged Mr. Fage to the extent that would enable plaintiffs to recover. Defendants contend there is insufficient factual evidence for plaintiffs to establish they will be able to satisfy their evidentiary burdens at trial on any of these issues. Plaintiffs argue, however, that if the trial court had applied the proper standard to the expert evidence submitted in opposition to the motion, it would have recognized that there were genuine issues of material fact in dispute.
Expert opinion testimony is no longer automatically excluded from consideration on summary judgments. In Independent Fire Insurance Company v. Sunbeam Corporation, 98-2181 (La.2/29/00), 755 So.2d 226, the supreme court struck down this court's settled rule that the opinions or beliefs of experts are not the type of personal knowledge contemplated by Code of Civil Procedure article 967 and *179 are thus inadmissible on summary judgment. The court held that when motions for summary judgment are supported or opposed by expert opinion evidence, the trial court must consider that evidence if it would be admissible at trial. Independent Fire, 755 So.2d at 228. In considering whether expert opinion testimony will be admissible at trial, several important principles must be kept in mind. First, the court cannot make credibility determinations but must assume that all of the affiants are credible. Second, the court may not attempt to evaluate the persuasiveness of competing scientific studies, focusing solely on the principles and methodology, not the conclusions they generate. Third, the court must draw those inferences from the undisputed facts that are most favorable to the party opposing the motion. Fourth, and most important, as summary judgments deprive litigants of the opportunity to present their evidence to a jury, they should be granted only when the evidence presented at the motion for summary judgment establishes that there is no genuine issue of material fact in dispute. Independent Fire, 755 So.2d at 236.
The trial court decided this case before the supreme court's decision in Independent Fire. In accordance with long-standing law of the first circuit, the trial court refused to consider the report of Robert D. Voogt, Ph.D., authenticated by his affidavit, which was submitted in opposition to the summary judgment. The court found it was inadmissible because it was not based on personal knowledge but was based only on a review of Medico's records, Mr. Fage's previous medical records, and various depositions. In light of Independent Fire, however, we may not automatically exclude Dr. Voogt's report and affidavit but must determine at the outset whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or to determine a fact at issue. Independent Fire, 755 So.2d at 234. To do so, we must make a preliminary assessment of whether his reasoning or methodology is scientifically valid and whether his reasoning or methodology can properly be applied to the facts at issue.[4] Id. We must make this same analysis of the other expert opinion testimony offered in this case as well.

HAVE DEFENDANTS SHOWN LACK OF FACTUAL SUPPORT FOR THE ESSENTIAL ELEMENTS OF PLAINTIFFS' CLAIM?

1) Did an incident occur?
The parties agree that, unfortunately, Mr. Fage's brain injuries render him incompetent to testify. The Medico records, however, clearly show that he reported incidents of other patients frightening him,[5] and the sworn statement of Mrs. Fage reveals he reported such incidents to *180 her. Furthermore, Dr. James Blackburn, Mr. Fage's treating psychiatrist, testified Mr. Fage had "a really traumatic time" at Medico. He stated Mr. Fage had given him several versions of what happened, but the essence was that one of the other patients "whom he thought was completely psychotic and deranged ... was coming in his room, was going to attack him, had made threats to him and had made him become very anxious and paranoid." Dr. Blackburn described the patients at Medico as "kind of a scary bunch unless you're used to working with them." Jeanne Pollock, program director at Medico, testified Mr. Fage had a problem with one of the other patients who suffered from "a substantial behavioral disorder." She stated that if Mr. Fage said he felt threatened, she would believe him.

2) Did the incidents cause Mr. Fage to leave Medico?
Mrs. Fage testified regarding the facts surrounding her husband's departure from Medico. She stated her husband told her about incidents at Medico involving other patients that frightened and bothered him, but those incidents were not "the main reasons" she removed him from Medico. She stressed the family members' need to be together. He called her on the telephone saying that if she did not come get him, he was walking out, and for her to deal with situations like that over the telephone was "next to impossible."
Three expertsDr. Blackburn, Dr. Michael E. Howard, a neuropsychologist specializing in brain injury rehabilitation, and Dr. Voogt, a certified rehabilitation specialistgave opinions regarding Mr. Fage's reasons for leaving Medico. Dr. Blackburns' testimony was based on his continuing psychiatric treatment of Mr. Fage.
Dr. Howard saw Mr. Fage for a total of approximately 20 hours to evaluate him for INA. He also reviewed depositions and records from Medico. Dr. Voogt saw Mr. Fage once to develop a life-care plan and reviewed depositions, medical records, and the records from Medico. Experts are permitted to render opinion testimony based on facts made known to them; he or she may rely on data prepared by others. La. C.E. art. 703; Barre v. Bonds, 99-1806, p. 21 (La.App. 4th Cir.5/10/00), 763 So.2d 60, 72; State v. Pooler, 96-1794, p. 50 (La.App. 1st Cir.5/9/97), 696 So.2d 22, 55, writ denied, 97-1470 (La.11/14/97), 703 So.2d 1288. Without making any credibility determinations, we conclude that all three experts used acceptable methodology in reaching their conclusions, and thus we must consider their opinions in determining whether a genuine issue of material fact exists.
Dr. Howard testified Mr. Fage told him the incidents at Medico that "scared him to death" caused him to leave. Dr. Howard stated Mr. Fage's perception was that the frightening incident "was the major event." Mr. Fage's close attachment to his wife was another factor, and Dr. Howard could not determine with certainty which reason was the precipitating event; both factors contributed to his decision. Dr. Voogt agreed that the incident caused Mr. Fage to leave, stating he was "frightened away from rehabilitation."
Dr. Blackburn stated that Mr. Fage always gave his experience at Medico as his reason for refusing to agree to inpatient care. Dr. Blackburn believed, however, that Mr. Fage saw his Medico experience as an "acceptable excuse," but the "real reason" was the codependency situation in his marriagehe did not want to leave home, and his wife did not want him to leave.

*181 3) Did the incident prevent him from receiving rehabilitation?

Dr. Voogt believed that the incidents at Medico prevented Mr. Fage from receiving any other inpatient rehabilitation. He stated:
To remove him from his family and then expose him to a frightening situation [was] enough to deter anyone from engaging in rehabilitation activity. This is especially true with an individual who has sustained a traumatic brain injury and is unable to reason through a situation. It was not possible for Mr. Fage to understand that not all rehabilitation centers have this type of problem.
Dr. Howard testified he could not state more probably than not that the Medico incident prevented Mr. Fage from receiving rehabilitation. He stated:
It was a combination of events that happened to this man. Of the two things, he says that [the Medico incident] was. All I can do is take it from him. I have no other information that the man lied to me about anything else. But his perception was when I saw him was that this was the major event. Now, whether or not that is the major event, I think it played a role, but I can't tell you how big a role.
Dr. Blackburn, on the other hand, believed the Medico incident was simply an excuse Mr. Fage used to avoid inpatient treatment, when the real reason was his dependency on his wife. When asked in his deposition if the Medico incident caused Mr. Fage not to undergo later inpatient hospitalization, Dr. Blackburn replied, "No. I think they ran that out or he did as what he thought would be an acceptable excuse. But my own experience, it became painfully obvious that the real reason he didn't want to go inpatient or go away was he didn't want to leave home ...."

4) Was Mr. Fage damaged as a result of the Medico incident?
Just as they do on the other issues, the experts' opinions sharply contrast on the issue of whether Mr. Fage was harmed by not receiving inpatient rehabilitation. Dr. Howard strongly believed that Mr. Fage did not reach the level of functioning he should have because of the lack of inpatient rehabilitation. He stated, "I can't guarantee to you that Russell Fage would have done a lot better had he gotten that treatment, but I can tell you no question that it's more likely than not." He further stated, "I think he would be significantly further along. How much I can't tell you, but he would be better now than ... he is now, I think."
Dr. Voogt stated in his report that if Mr. Fage had not been frightened away from rehabilitation and his family had been made a part of his treatment team, he could have had results that would have met Dr. Howard's original expectations that Mr. Fage had a greater than 50% probability of returning to some type of competitive employment. He concluded, "I am fearful that this window of opportunity may now be less than probable."
Dr. Blackburn disagreed with Dr. Howard and Dr. Voogt. He stated that if Mr. Fage was harmed by the Medico incident, he "couldn't define it or find it particularly." When deposed in 1992, Dr. Blackburn believed that Mr. Fage would be harmed if he did not receive inpatient treatment. He stated, "He has the choice. He can either go and get some treatment in a facility that's equipped to do it and stay there and get better, or he's going to be more and more likely to get into a posture of some permanent disability." He felt Mr. Fage had made more progress in his ten days of inpatient treatment at Medico than he did in the whole previous year.
*182 Looking back on Mr. Fage's outpatient treatment with the benefit of 20-20 hindsight, however, in 1995, Dr. Blackburn testified that Mr. Fage would not have progressed any more in an inpatient program than he had using various outpatient rehabilitation efforts:
Clearly our feeling ... at the time was that [inpatient treatment] was that this was what he needed and it was going to give him the most efficient, most effective mode of improvement. Again, now that we have the benefit of hindsight, it's clear that Mr. Fage, with a lot of local efforts, family and various other people doing rehab with him, has improved probably at about the same rate.

CONCLUSION
The only direct witnesses to Mr. Fage's encounter with the other patient at Medico are Mr. Fage and the patient, both of whom, the parties concede, have injuries too severe to permit them to give competent testimony. Circumstantial evidence abounds, however, leaving this issue ripe for consideration by a jury. The only person who knows for sure why Mr. Fage failed to return to Medico is Mr. Fage. He told his doctors it was because of what happened at Medico, but his psychiatrist, Dr. Blackburn, does not believe him. This too is a question for a jury, who may or may not accept the psychiatrist's opinion.
The remaining two issuesthe effect of the Medico incident on Mr. Fage's future rehabilitation, and potential damageare matters on which expert witnesses can only give opinions, based on their knowledge and expertise. The opinions of the experts in this case differ. While the movers pointed out to the court an absence of factual support for one or more elements essential to the plaintiffs' claim through the testimony of Dr. Blackburn, plaintiffs countered with the testimony of Dr. Howard and the report of Dr. Voogt, which provide factual evidence sufficient to establish that plaintiffs will be able to satisfy their evidentiary burden of proof at trial on each of these issues. The conflicting opinions in this case create genuine issues of material fact sufficient to preclude summary judgment. For this reason, the trial court's grant of summary judgment and dismissal of plaintiffs' case must be reversed at defendants' cost. This suit is remanded to the district court for further proceedings.
REVERSED AND REMANDED.
KLINE, J., dissents with reasons.
PETTIGREW, J., dissents and adopts the reasons assigned by Judge KLINE.
KLINE, J., dissenting.
I respectfully dissent, and upon de novo consideration of the motion for summary judgment, I would grant the motion and dismiss the plaintiff's case.
The victim suffered severe head and brain injuries and unfortunately is not able to testify. The majority opinion states that the parties agree that Mr. Fage is an incompetent witness.
This case presents a unique situation in which the endeavor is to discern through expert witnesses the motive and reason that Mr. Fage wishes to be at home with his wife as opposed to being institutionalized.
As correctly stated in the majority opinion, experts are permitted to render opinion testimony based on facts made known to them and may rely on data prepared by others.
In evaluating expert opinion testimony the court cannot make credibility determinations but must presume that all of the affiants are credible. It is further acknowledged that the court may not attempt *183 to evaluate the persuasiveness of competing scientific studies, focusing solely on the principles and methodology, not the conclusions they generate.
In addition, experts may rely on facts or data that need not be admissible in evidence. LSA-C.E. art. 703.
In this case, we are permitted to inquire into the reliability of those matters on which the experts based their opinion.
We have an admittedly incompetent witness who related reasons why he does not wish to remain at the defendant's facility.
If the predicate reasoning by Mr. Fage is not reliable because of incompetence, then the opinions of the experts are subject to being conjectural and speculative.
Trustworthiness is a touchstone of evaluating inherent reliability in situations whether the declarant is either available or unavailable.
In this case, Mr. Fage is not available for the trier of fact, and cannot be so because of his impairment.
I would then question the reliability of the experts' opinions relative to his motives.
Additionally, we should not place ourselves in a posture where the experts are permitted to tell the trier of fact whether the unavailable incompetent witness is or is not telling the truth. In essence, the experts cannot relate whether any witness can be believed or not believed.
We have consistently held in sexual abuse cases where witnesses of tender ages testify, that the experts cannot tell the triers of fact that, in their opinion, the witness is telling the truth.
We cannot in summary judgment matters judge the credibility of the experts, but we ought not allow experts, retained or appointed, to relate their opinions that an incompetent witness is or is not credible.
Note that Dr. Blackburn, treating psychiatrist, believed that Mr. Fage saw his Medico experience as an "acceptable excuse", but the "real reason" Mr. Fage left was the codependency situation in his marriagehe did not want to leave home and his wife did not want him to leave.
Dr. Howard, the neuropsychologist specializing in brain injury rehabilitation, related that Mr. Fage told him the incidents at Medico "scared him to death" and that Mr. Fage's perception was that the frightening incident was the major event that caused him to leave. Dr. Howard was of the opinion that Mr. Fage's close attachment to his wife was another factor in the decision to leave the facility. Dr. Howard could not determine with certainty which reason was the precipitating event and believed that both factors contributed to Mr. Fage's decision. Dr. Howard could not state more probably than not that the Medico incident prevented Mr. Fage from receiving rehabilitation.
Dr. Robert D. Voogt who saw Mr. Fage once, but reviewed records, was of the opinion that Mr. Fage was "frightened away from rehabilitation", and that was his motive for wishing to leave.
The medical notes at Medico do reflect that Mr. Fage was a fearful patient. We need to be mindful of the increasing social sensitivity to the duty owed by healthcare facilities to the infirm or incompetent. Breach of those duties can by proved by competent evidence and certainly with the use of experts.
However, in this case the predicate source of the experts' opinions cannot pass the trustworthiness or reliability tests, and further, the experts should not be permitted to relate their opinions on the credibility of the non-testifying incompetent witness.
*184 Testimony on credibility has the effect of putting an impressively qualified expert's stamp of truthfulness on a witness's testimony. How much more so when the witness cannot testify before a trier of fact because of incompetence.
The 1996 amendment to the summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action. The procedure is favored and shall be construed to accomplish those ends. The evidentiary rules were not intended to make summary judgment impossible whenever a party has produced an expert to support his or her position. In my humble opinion the evidence supporting plaintiff's position is insufficient to allow a reasonable juror as trier of fact to conclude that the plaintiff's position is more likely than not.
We should be free to grant the summary judgment in this case.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The Fages' suit was filed in federal court. Because that suit is not part of this record, we do not have the details of the relationships between the parties to that suit. That information, however, is irrelevant to our decision regarding the summary judgment.
[3] Three separate contribution suits were filed, one in Washington Parish and two in St. Tammany Parish. The Washington suit was transferred to St. Tammany, and the three suits were consolidated.
[4] The supreme court adopted the factors for determining admissibility of expert opinion evidence set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993), and State v. Foret, 628 So.2d 1116, 1122: whether the technique has been subjected to peer review and/or publication, the "known or potential rate of error," the existence of standards controlling the technique's operation, the technique's refutability or testability, and the general acceptance in the scientific community.
[5] Medico notes of August 8, 1990, state Mr. Fage stated "he was `spooked' by" another patient, and hospital staff spoke to him about how to handle himself with that patient. On August 10, 1990, the notes state he "[b]ecame frightened & ran during an episode" with the same patient. The notes of August 12, 1990, show Mr. Fage was "concerned about other clients coming in room at night."